UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                                    CRIMINAL ACTION

VERSUS

JESSE ALLEN BURCHAM                                         NO.: 15-00173-BAJ-EWD

RULING AND ORDER

Before the Court are Defendant Jess Allan Burcham's **Motion to Suppress Evidence and Statements (Doc. 26)** and **Motion to Compel Discovery (Doc. 28)**. Defendant seeks to suppress the evidence seized during a traffic stop on May 3, 2015. (Doc. 26 at p. 1). Further, Defendant seeks to compel the production of all recorded documents pertaining to his traffic stop, a list of all traffic stops made by the law enforcement officers in this case for the period 30 days before and 30 days after Defendant's traffic stop, delineating when tickets were given and/or arrests were made, and information on any drug dogs utilized during the search of his vehicle. (Doc. 28 at p. 1). The United States of America ("Government") filed a memorandum in opposition to both motions. (Docs. 32, 33). The Court held an evidentiary hearing on the motions, and permitted the simultaneous filing of post-hearing briefs. (Doc. 44).

I.   BACKGROUND

On May 3rd, 2015 Officer Rusty Jenkins ("Officer Jenkins") of the Baton Rouge Police Department, while traveling East on I-12, observed a vehicle that appeared to be going faster than the posted 60 mile per hour speed limit. (Doc. 44, Hr'g Tr. at p.

17:21-23). Officer Jenkins then paced the vehicle and confirmed that the vehicle was driving 9 miles over the speed limit. (*Id.* at 17:23-25). Officer Jenkins also noticed that the rear tail lights appeared to be brighter than a normal running light, and that the vehicle was drifting back and forth inside of its lane. (*Id.* at 14:4-9). An officer with the Baton Rouge Police Department for four years, Officer Jenkins was assigned to the High Intensity Drug Trafficking Area ("HIDTA") Task Force, and was alone when he turned his lights on to signal the speeding vehicle to pull over to the side of the road. (*Id.* at 15:22-25, 14:1-17, 18:10-17).

Defendant was operating the vehicle and was its lone occupant. (*Id.* at 19:8-9). Officer Jenkins approached the vehicle and asked Defendant to step out onto the side of the road with his driver license and insurance. (*Id.* at 19:12-25, 20:1-3). Officer Jenkins then discussed with Defendant the reasons for the stop. (*Id.*). Officer Jenkins testified that Defendant's responses seemed elongated, as if Defendant was nervous. (*Id.* at 40:11-25). The first issue Officer Jenkins addressed was the lights. (*Id.* at 20:12-17). Defendant indicated that the car came from the factory in that condition. (*Id.*). Officer Jenkins then inquired about the speeding. (*Id.*). Defendant apologized, and indicated that he was unaware he was traveling so quickly. (*Id.*).

Officer Jenkins asked about the drifting back and forth. (*Id.* at 20:19-23). Officer Jenkins testified that his primary concern was that Defendant may have been fatigued from driving a long distance, so he questioned Defendant about his itinerary. (*Id.*). Defendant responded by claiming that he had driven from, "Near Colorado." (*Id.* at 20:25). Officer Jenkins testified that he considered this response to be peculiar, stating, "because most people that I ask that, they may give a big city. They may say,

'I'm coming from near Baton Rouge or coming from near Houston,' but never near a whole state." (*Id.* at 21:1-7).

Officer Jenkins then continued to ask Defendant about his travel. (*Id.* at 21:8-19). Defendant indicated that he was traveling for work, and that he was involved in private security. (*Id.*). In response, Officer Jenkins then asked if Defendant had any weapons on Defendant's person. (*Id.*). Defendant advised that he was unarmed. (*Id.*). Officer Jenkins testified that he believed this to be suspicious because Officer Jenkins believed that someone in private security would be armed. (*Id.* at 21:21-24).

Approximately two minutes had passed from the time Officer Jenkins pulled the vehicle over to the time he decided to search the vehicle. (*Id.* at 22:10-14). Officer Jenkins returned to his patrol unit and called for back-up officers to assist him. (*Id.* at 22:1-4). Shortly thereafter, Officer Brad Bickham, Corporal Luke Cowart, and Corporal Cody David arrived on the scene. (*Id.* at 22:5-6). Officer Jenkins then asked Defendant for consent to search the vehicle. (*Id.* at 22:20-23). Defendant provided consent. (*Id.*). At no point did Officer Jenkins run the driver's license to check for outstanding warrants. (*Id.* at 23:10-17, 42:14-17).

During the search, Corporal Cowart noticed that the torque head screws on the inner rear fender well appeared to have had "fresh tool marks," indicating that it may have recently been taken off using a screw driver or other tool that while being unscrewed, also removed paint from the screws. (*Id.* at 25:1-7, 51:3-6). In other words, the officers thought the conditions of the screws was unusual for a new car. (*See Id.* at 51:6-10). This led the officers to look underneath the vehicle where they located an aluminum box that did not appear to be an original feature of the car, but was likely

3

an after-market addition. (*Id.* at 25:9-16). Officer Jenkins testified that he suspected the box to be a compartment designed to conceal something. (*Id.* at 25:23-25). The officers opened the trunk, looked inside, and confirmed their suspicions that a concealed compartment had been added to the vehicle. (*Id.* at 26:10-12). The compartment was found to contain 12 kilogram-sized packages of cocaine wrapped in black duct tape. (*Id.* at 31:14-25, 32:1-2). After discovering the compartment, but before the discovery of the drugs, Defendant was placed in handcuffs and read his *Miranda* rights. (*Id.* at 27:14-16).

## II. DISCUSSION

### A. MOTION TO SUPPRESS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "exclusionary rule" is a judicially created deterrent adopted to effectuate the protections of the Fourth Amendment. *Elkins v. United States*, 364 U.S. 206, 217, 80 S. Ct. 1437, 1444, 4 L. Ed. 2d 1669 (1960). "Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974). The prohibition equally applies to the fruits of the illegally seized evidence. *Id.*

Of course, the Fourth Amendment's protection against searches and seizures is not absolute. The United States Supreme Court has consistently emphasized that "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quotation marks omitted)

(quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)). As such, "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)).

It is well established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation marks omitted) (quoting *Katz*, 389 U.S. at 357). Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)). However, in cases where a search is not conducted pursuant to a warrant, the Government bears the burden of proving that the search was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Castro*, 166 F.3d 728, 733 n.6 (5th Cir. 1999)). Here, Defendant argues that he was subjected to unlawful seizure and search in violation of the Fourth Amendment.

"The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). To analyze the legality of a traffic stop, courts utilize the two-step standard articulated by the Supreme Court in *Terry v. Ohio*. *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) (citing *Brigham*, 382 F.3d at 506). Under the first step, courts determine "whether the officer's action was justified at its inception." *United States*

*v. Jenson*, 462 F.3d 399, 403 (5th Cir. 2006). Under the second step, courts evaluate "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506. In this case, there is no question that the stop was justified at its inception because Officer Jenkins testified that he pulled over Defendant because Defendant was driving over the posted speed limit. (Doc. 44, Hr'g Tr. at p. 17:21-23). The question of legality, therefore, turns on the duration of the stop.

A traffic stop that is justified at its inception can nevertheless violate the Fourth Amendment if it is prolonged beyond the time reasonably required to complete the mission of the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The authority for the stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, ___ U.S.___, 135 S. Ct. 1609, 1614 (2015) (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

The "mission" of a traffic stop is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (internal citations omitted). To effectuate the mission, an officer may check the driver's license, check for outstanding warrants against the driver, and inspect the vehicle's registration and proof of insurance. *Id.* at 1615. The officer may also ask about the purpose and itinerary of the driver's trip. *United States v. Pena-Gonzalez*, 618 F. App'x 195, 198 (5th Cir. 2015) (quoting *United States v. Fishel*, 467 F.3d 855, 857 (5th Cir. 2006)). "These 'matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure,'" so long as the duration of the stop is not extended beyond when the tasks tied to the traffic infraction should have reasonably

been completed. *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (internal citation omitted)). So, if an officer goes beyond those tasks, then the extension of the stop may be in violation of the defendant's constitutional rights. *Rodriguez*, 135 S. Ct. at 1614.

However, a stop may be prolonged if reasonable suspicion of additional criminal activity emerges while an officer is completing the mission of the stop. *United States v. Spears*, 636 F. App'x 893, 901 (5th Cir. 2016). "If the officer develops reasonable suspicion of additional criminal activity, . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.* (alterations in original) (quoting *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013)).

In this case, the seizure was extended beyond the scope of a traffic stop. Officer Jenkins had Defendant's license and registration, and had already informed Defendant of the reasons for the stop. (Doc. 44, Hr'g Tr. at p. 23:6-12). Yet, the evidence revealed that there was reasonable suspicion to extend the stop. Officer Jenkins offered the following factors in concluding reasonable suspicion justified continuing the stop: 1) the elongated answers to questions, 2) Defendant's statement that he had traveled from "Near Colorado," and 3) the absence of a firearm on someone claiming to be security personnel. (*Id.* at 40:1-25-41:1-5).

"Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). This is a low standard; "[a]lthough an officer's reliance on a mere

7

hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

Here, the Court finds unpersuasive the officer's assertion that the absence of a firearm under these circumstances created reasonable suspicion. The Government does not cite any case law in which the *absence* of a firearm, under these or similar circumstances, justifies an officer's reasonable suspicion. The Government argues that the reason the absence of a gun was suspicious was because Defendant testified that he was involved in private security, and so should have had a gun on his person. However, the record is clear that Defendant was not engaged in actual protection services at the time of the encounter, and so he had no reason to be armed. (*Id.* at 41:7-10).

Nonetheless, the other two reasons provided by the Government, taken together, are enough to amount to reasonable suspicion. First, the higher courts have consistently found that evidence of nervousness—such as elongated answers to questions—supports a finding of reasonable suspicion. *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. Sokolow*, 490 U.S. 1, 9 (1989) (finding nervousness to be relevant when determining if an officer had reasonable suspicion); *United States v. Pack*, 612 F.3d 341, 362 (5th Cir.), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010) (finding that nervousness contributed to

the officer's reasonable suspicion of criminal activity to justify extending the stop of a vehicle). Thus, this fact tips the scales in favor of the Government.

Next, Defendant's response about his travel plan also provided a lawful basis to extend the stop. Officer Jenkins testified that it was peculiar to him that Defendant claimed he was coming from "near Colorado" because, in his experience, no person has ever claimed to be coming from around an *entire* state. (Doc. 44, Hr'g Tr. 21:4-7). Seemingly untruthful answers to questions have been held to be a relevant factor that weighs in favor of the government in a reasonable suspicion analysis. *See Estrada*, 459 F.3d at 632 (recognizing that inconsistent responses to questions weighs in favor of a finding of reasonable suspicion). *See also United States v. Davis*, 620 F. App'x 295, 299 (5th Cir. 2015) (arguing that seemingly false statements about travel plans aided in justifying extension of a stop of a vehicle). Thus, Defendant's peculiar answer about his travel plans, coupled with his elongated responses, provided reasonable suspicion to extend the stop.

1. Consent to Search

The Court will next consider the constitutionality of the search. A warrantless search is unconstitutional unless it meets one of a limited number of exceptions. *United States v. Zavala*, 459 F. App'x 429, 433 (5th Cir. 2012) (citing *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995)). "One exception is a search conducted pursuant to voluntary consent." *Id*. Consent to search is valid only if it is given freely and voluntarily. *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993) (quoting *Kelley*, 981 F.2d at 1470). Of course, the Government bears the burden to show by a preponderance of the evidence that consent was voluntary. *Id*.

Courts analyze the voluntariness of consent by examining six factors: "(1) the voluntariness of the defendant's custodial status, (2) whether the police engaged in coercive conduct, (3) the extent and degree of the defendant's cooperation with the police, (4) the defendant's knowledge of his right to refuse consent, (5) the defendant's level of intelligence and education, and (6) the belief of the defendant that a search will not reveal incriminating evidence." *Zavala*, 459 F. App'x at 433 (citing *Jenkins*, 46 F.3d at 451). No single factor is dispositive of consent. *Id*. In most cases, "some of [the] factors will not be seriously implicated, and only one or a subset of the factors will truly be at issue and drive the ultimate conclusion." *Id*. After considering each of the six factors, the Court finds that Defendant's consent was voluntary within the standards establish by *Zavala*.

This is true even though the first factor, voluntariness of custodial status, does not weigh in favor of the Government. Although Defendant was never told that he had to remain with Officer Jenkins, Officer Jenkins testified that Defendant could not leave the scene. (Doc. 44, Hr'g Tr. 27:5-8). Thus, the first factor weighs in favor of Defendant.

The second factor, coercive police conduct, weighs in favor of the Government. Police conduct is coercive only if the conduct goes beyond what would typically be expected by an officer under the circumstances. *See, e.g., United States v. Guevara-Miranda*, 640 F. App'x 319, 321 (5th Cir. 2016) (holding that speaking the English language to persons who did not appear to speak English is not coercive when the officer conducts himself in an otherwise professional manner); *United States v. Tompkins*, 130 F.3d 117, 122 (5th Cir. 1997) (finding police conduct was not coercive,

10

even though officer implied that it was hopeless to resist consenting to the search, when the defendant was not otherwise restrained and no threats of violence or otherwise were made). In this case, no threats were made to Defendant, nor was he placed in restraints when Officer Jenkins asked for consent. (Doc. 44, Hr'g Tr. 19:12-17, 68:2-8). Therefore, this factor weighs in favor of the Government.

The third factor, cooperation with the officers, militates in favor of the Government. The evidence demonstrates that Defendant was cooperative throughout the encounter with the officers. (Doc. 44, Hr'g Tr. 23:22-25, 24:1-2).

The fourth factor, knowledge of the right to refuse consent, weighs against the Government. When an officer retains possession of a defendant's personal effects, as was the case here, the Fifth Circuit has "found it important that the officer expressly inform the suspect of his right to refuse consent." *Zavala*, 459 F. App'x at 434. The record indicates that Officer Jenkins took Defendant's license and registration, (Doc. 44, Hr'g Tr. 19:24-25, 20:1-4), but it does not indicate that he returned them. Nor does it indicate that Defendant was made aware of his right to refuse consent.

The fifth factor, level of intelligence and education, militates in favor of the Government. Defendant seemingly understood the instructions provided by the officer, and was able to speak with the officer about several issues. (Doc. 44, Hr'g Tr. 20:13-25, 21:9-19). It further appears from the evidence that Defendant had a clear understanding of the situation, and was at least intelligent enough to ask for an attorney immediately after being read his *Miranda* rights. (Doc. 44, Hr'g Tr. 28:23-25). Such an understanding suggests adequate intelligence.

The final factor, a defendant's belief that the search would reveal incriminating evidence, likely cuts in favor of the Government. When Defendant was asked whether drugs were in the vehicle, the Defendant responded that he did not possess any drugs. (Doc. 44, Hr'g Tr. 23:24-25, 24:1-2). Nevertheless, drugs were hidden well enough the vehicle in an elaborate manner, (Doc. 44, Hr'g Tr. 31:4-12), suggesting that Defendant likely believed the drugs were hidden adequately, as to withstand an extensive search by authorities. As a result, Defendant likely believed the drugs would not be found, and thus, the final factor weighs in favor of the Government.

After weighing each of the factors, the Court is satisfied that the Government has proven that Defendant voluntarily consented to the search.

2. Conversion of the Investigatory Stop and Probable Cause

Having found that Defendant's purported consent was voluntary, the Court now explores whether the investigatory stop converted into an arrest requiring probable cause. Defendant's final argument is that even if there was reasonable suspicion to extend the stop, there was no probable cause to convert the investigatory stop into an arrest, which occurred prior to the discovery of the cocaine.

When police detain a suspect outside the scope of the investigatory detention, the detention converts into an arrest requiring probable cause. *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993). There is no bright line rule for determining when an investigatory stop is converted into an arrest.

> [U]sing some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause. . . . The relevant inquiry is always one of reasonableness under the circumstances.

12

*Id.*

In analyzing this issue, the Fifth Circuit requires consideration of whether, at some point during the encounter, a defendant threatened the status quo of the search or the safety of the officers. *See, e.g., United States v. Abdo*, 733 F.3d 562, 565 (5th Cir. 2013) (holding that placing the defendant in the back of the officer's car at gunpoint during an investigatory stop did not convert the stop into an arrest because the officers had reason to believe the defendant was armed and dangerous); *United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999) (finding that placing the defendant in handcuffs and inside the officer's car did not convert the investigatory stop into an arrest because the actions were taken for the purpose of protecting officers from violent actions by the defendant); *see also United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985) (holding that officers were "authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.").

Here, the evidence shows unequivocally that the investigatory stop was converted to an arrest. Not only was Defendant handcuffed, but Defendant was read his *Miranda* rights, and placed in a police car. (Doc. 44, Hr'g Tr. at pp. 27-29). Further, the officers did not take these steps to protect them from someone that was "armed and dangerous," as the officers knew Defendant was not armed.

However, the arrest was constitutionally permissible because the officers had probable cause to believe that Defendant was involved in drug smuggling based on the totality of the circumstances. "Whether probable cause exists depends upon the

13

reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Like reasonable suspicion, courts look to the totality of the circumstances in determining whether there is probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). "[U]nder the law of this circuit, evidence of a hidden compartment supports 'probable cause' for a search/arrest. . . ." *United States v. Estrada*, 459 F.3d 627, 633 (5th Cir. 2006); *see also United States v. Inocencio*, 40 F.3d 716, 724 (5th Cir. 1994).

The totality of circumstances clearly supports the Government's argument that the officers had probable cause to arrest Defendant. In addition to Defendant's elongated answers to questions and peculiar answer about travel plans in response to questions by the officer, the discovery of the concealed compartment justified the arrest. *See Estrada*, 459 F.3d at 633.

### B. MOTION TO COMPEL

Defendant has also asked that the Court compel the production of certain discovery. Specifically, Defendant has asked for: 1) documentation of communications made between the officers, including video footage of the stop, 2) "lists" of tickets that the arresting officers issued within 30 days before and after Defendant's stop, and 3) information on drug dogs used during the search.

Practically speaking, "a court cannot compel a party to produce documents that the party does not possess or that the Court does not know exist." *Washington v. Tubbs*, No. 3:13-CV-0217, 2013 WL 6796429, at *2 (W.D. La. Dec. 19, 2013). This is because the Federal Rules of Criminal Procedure only require the production of

existing documents or evidence. *See* Fed. R. Crim. P. 16. In this case the Government has argued, and testimony has shown, that what Defendant seeks does not exist.[1]

First, the testimony adduced at the hearing on the motion to suppress indicates that items described in Defendant's first request do not exist because the officers communicated through radios that do not create records of communication. (Doc. 44, Hr'g Tr. at pp. 95:3-12). Additionally, the officers also testified that camera footage on that particular day is unavailable because the aging video system was inoperative on that day, and throughout the period of the traffic stop. (*Id.*). Defendant does not provide any testimony or evidence to contradict this testimony. Thus, the Court is left to conclude that such evidence does not exist; accordingly, Defendants first request for records of the officer's communications with one another is denied.

As to the second request, concerning lists of traffic tickets issued by the officers involved in this case, the Government has indicated that no such "list" of traffic stops exists. (*Id.* at 12:7-17). In fact, Defendant conceded during the hearing that he can present no evidence to the contrary. (*Id.* at 9:19-22). Thus, this request must also be denied.

Finally, the testimony indicated that no drug dogs were used while searching Defendant's vehicle. (*Id.* at 42:21-25, 43:1-2, 50:10-20). Accordingly, the request for information on drug dogs used during the traffic stop is denied.

---

[1] Defendant, in addition to seeking to compel the evidence, has invited this Court to fashion a new rule, akin to a missing persons exception, in which the Court would assume that this missing evidence is necessarily in favor of the Defendant and adverse to the Government. The Court declines to do so.

15

## III. CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Defendant Jesse Burcham's **Motion to Suppress (Doc. 26)** is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Jesse Burcham's **Motion to Compel Discovery (Doc. 28)** is **DENIED**.

Baton Rouge, Louisiana, this 30th day of September, 2016.

_____
**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**